Submitted on briefs February 4; reversed April 1; motion to strike cost bill and rehearing denied May 1, 1930

## DE MARS *v.* HEATHMAN

(286 P. 144)

*Crum, Murdoch & Dusenbery, Collier, Collier & Bernard* and *William G. Smith,* all of Portland, for appellant.

*B. A. Green* of Portland for respondent.

BROWN, J. Defendant's motion for a judgment of involuntary nonsuit is somewhat involved with his argument in support thereof. So far as material to the issues, it reads:

"Your honor, at this time we would like to interpose a motion for a nonsuit, on the ground and for the reason that the evidence as adduced here fails to show any actionable negligence on the part of the defendant. There is no testimony that tends to show any negligence except that there was some grease on the floor."

The plaintiff testified, in substance, that she had been in the employ of the operator of the hotel for about

two months prior to the date of the accident, at a wage of $60 a month; that it was her duty to care for the rooms on the sixth floor of the hotel, and that her hours for working were from 8:00 o'clock a. m. to 4:00 p. m.; that on the morning she received the injuries she entered the hotel by the employees' entrance in the rear of the building. With respect to the arrangement of this entrance, she said:

"I walked into the long hall, then turned into a shorter hall, then make another turn. There is a flight of eight steps as I come to the landing. I was about 6 or 12 inches from the first step, so that my feet went out from under me, I fell and realized I was getting on my back, so I turned on my side. I injured my left side instead of breaking my spine.

"Q. How far did you fall? A. I went the full length of the stairs."

She testified that after she had been picked up by a waitress and one of the cooks she felt faint, so she sat down on the floor until she began to feel better. As to what then transpired, she said:

"Then I went upstairs to see what I slipped on, and I seen the stairs where there was grease.  *  *  * There was a large spot like gravy or soup or grease that was spilled on that step at the top of the sairs, and there was some on the next two steps, a smaller amount."

Concerning the procedure on reporting for work in the morning, she testified:

"Well, we didn't have anywheres to report particularly; just went in and got our keys in the linen room, that is, in the basement; and then go up to our floors, wherever we were working.

"Q. Now, where were those keys, tell the jury? A. In the linen room in the basement. They had a room there where they kept supplies and things that we used upstairs, and the keys were kept there.
 *       *       *       *       *

"Q. Yes. Now, where did you enter the hotel? A. Well, by the rear entrance for employees.

"Q. And had you been using this entrance all the time during your employment there? A. No, just the last two or three weeks that I was employed there we were compelled to use it, that entrance. We had used the front entrance before, up till they got that passage-way cleared so we could use that. Then we were told we would have to use that servants' entrance."

On cross-examination the plaintiff testified:

"Q. Was it light the same as it had been there each morning? A. I couldn't say whether the light was up there that morning that I fell or not. * * * The hallway wasn't lit well.

"Q. Well, would you say that there was or was not a light there? A. I couldn't say positively there was a light there, because the hall wasn't lit very well when I fell.

"Q. * * * I want you to tell this jury whether you say there was or was not a light there at all? A. Well, I couldn't say. I could not prove that. I could not answer that question.

"Q. You haven't any idea whether there was a light there or not? A. No, I just went down so quick I didn't realize anything.

\* \* \* \* \*

"Q. Then do you know whether they usually kept a light there? A. Well, I couldn't say positive.

"Q. Do you know whether or not they ever had a light there? A. I couldn't say positive. I know there wasn't any daylight.

\* \* \* \* \*

"Q. According to your statement you had been using that stairway each day (for 3 weeks) and you don't know as to whether there was any light in there? A. No, I couldn't swear whether there was a light there or not.

"Q. Not only that morning, but any morning? A. Yes. I could not, no; I couldn't say whether they ever kept a light there or not. I could not prove that.

614

"Q. Well, had you ever complained to anyone about not having lights there? A. No.

\*     \*     \*     \*     \*

"Q. How wide a place was there grease on that (the landing)? A. Well, I would say  \*  \*  \* 8 or 10 inches.  \*  \*  \*

"Q. Was it the whole length of the step? A. No, \*  \*  \* just where I happened to be standing there; \*  \*  \* about the center of the steps.  \*  \*  \* I couldn't tell what it was. It looked like grease though. It was something kind of slippery.  \*  \*  \* Grease or oil; well, it looked something like that on there. I couldn't say positively.

"Q. Will you describe what you saw? A. It was just like a grease or oil or something on there.

"Q. What kind of grease or oil, and how much of it was there? A. Well, it was just on the top of the surface, on top of the step.

"Q. Well, do you know anything about greases and oil? A. Well, oh, I could not describe what kind of grease was on there. No, I could not. It looked more like a meat gravy than anything like that, you know, something out of a pan, spilled.

"Q. A meat gravy? A. Something like that.

"Q. What do you mean, 'Something like that?' A. Well, it looked like a gravy, meat grease or something, that was up there.

\*     \*     \*     \*     \*

"Q. Now, you said something about knocking the heel off your shoe. A. I pulled the heel loose off my shoe.

"Q. Your shoe was off, too, after you got down on the landing? A. No. They were buttoned on. There is a little strap—a heel about 2 inches high; a Mary Pickford heel is what I think they were.

\*     \*     \*     \*     \*

"Q. You didn't make any complaint to anyone that there was grease on the floor? A. I never said anything like that, no.

"Q. No, at no time did you tell anyone about the hotel that grease caused you to fall, did you? A. No, I didn't, * * * because I didn't intend to tell them."

She testified that she and her daughter left the hotel at 2:30 p. m. on the day she was hurt and the grease was still there, and that her son-in-law examined the hallway and saw it there about 4:30 p. m. Relating to the condition of the top step of the stairway and of the landing as she observed it after the accident, plaintiff's daughter testified:

"Well, there was a spot of grease about, I would say about as large as that (indicating), about 7 or 8 inches. And there was a skid mark from where she had slipped down to the steps.

"Q. How far back of the top landing did that mark start? A. Well, I should judge about 6 inches.

* * * * *

"Q. That was about 2:30 in the afternoon? A. Yes."

On the question of liability for personal injuries alleged to have been sustained by reason of failure to light a hall or stairway, the case of *Gleich v. Detroit Free Press,* 169 Mich. 247 (135 N. W. 306), is squarely in point. In passing on this question, the court there said:

"The plaintiff went upon the premises in question by the express invitation or permission of the defendants. Under these circumstances it was their duty to see that the premises were in a reasonably safe condition of repair. The declaration does not allege, and the testimony does not disclose, that the injuries were incurred by reason of any structural defects in the hallway or stairs, and it is not claimed that the injuries were caused by any pitfalls or traps so far as construction was concerned, nor that there was any unusual or dangerous construction which would amount to a pitfall or trap. The negligence of the

defendants is based solely upon their failure to light the hallway and stairs. In the absence of contract or statute, we think no such duty rested upon the defendants. To require the owner or landlord to provide lights, at all times at his peril, for his halls, stairs, toilets, and other places used in common by his tenants, would add an additional duty which the law does not justify. The cases in which recoveries have been sustained for a failure to light such places have been confined to those cases where the darkness has concurred with some pitfall, trap, or unusual construction to produce the injuries. We have found no authority holding otherwise. This view of the law is in accord with the holdings of the court in several States: *Capen v. Hall*, 21 R. I. 364 (43 Atl. 847) ; *Gleason v. Boehm*, 58 N. J. Law 475 (34 Atl. 886, 32 L. R. A. 645) ; *Hilsenbeck v. Guhring*, 131 N. Y. 674 (30 N. E. 580) ; *Brugher v. Buchtenkirch*, 167 N. Y. 153 (60 N. E. 420) ; *Halpin v. Townsend*, 2 City Ct. R. (N. Y.), affirmed 107 N. Y. 683 (14 N. E. 611).''

See, also, *Jackson v. Grayson*, 13 Pa. Dist. R. 467, and *Brown v. Berles*, 234 Mich. 353 (208 N. W. 461).

From an examination of the record in this cause, it is apparent that the allegation that the stairs and the floor at the top of the stairs were covered with dirt and water at the time of the accident is not sustained by the evidence; nor does the evidence sustain the allegation that the stairway was not sufficiently lighted. So, then, these charges should be eliminated.

█ Now, with respect to the grease spot on the stairs and landing: So far as the testimony discloses, this spot was seen by the plaintiff and her daughter alone, notwithstanding the fact that the stairway was used by 60 or 70 persons on the day of the accident. In our consideration of the defendant's motion for a nonsuit, we shall assume that plaintiff's contention is correct. But be that as it may, there is nothing in the record

that tends to show that that spot was on the stairway prior to the time of the accident, or, if it was, that the defendant or his agents knew, or by the exercise of reasonable diligence could have known, of its existance. This fact is significant. In connection therewith, we note the following from the case of *Thompson Co. v. Phillips,* 22 Col. App. 428 (125 P. 563):

"But assuming that the grease was on the floor and was the cause of plaintiff's fall, before plaintiff can recover, there must be some evidence at least, tending to show that defendant or its agents knew, or by the exercise of reasonable diligence could have known this fact, before it may be held guilty of negligence."

The court then cites and quotes from *Reeves v. Fourteenth Street Store,* 110 App. Div. 735 (96 N. Y. Supp. 448), a case where the plaintiff fell on defendant's stairs, claiming she slipped on what "looked like as though someone had spit up a lot of phlegm there and it had laid there the way it was for two or three days, for it had dried around the edges of it, and that is what I took it I fell on." The opinion in that case was written by Mr. Justice Gaynor, one of the most eminent jurists known to the legal profession, and in the course of his discussion the learned justice said:

"The verdict was not justified either on the law or the facts. There was no evidence that the defendant knew of the mess on the stairway described by the plaintiff and her husband, nor from which it could be found that it was there so long that in ordinary care the defendant should have known of it and removed it. It could not remain there long with people constantly walking over it, to say nothing of the store being swept and cleaned daily."

This doctrine is sound, and, in the opinion of the writer, is peculiarly applicable to the facts in the case under consideration.

Another instructive case is that of *Jennings v. Tompkins*, 180 Mass. 302 (62 N. E. 265). In that case the plaintiff had purchased a seat in the gallery of the defendant's theater, and while walking down the wooden steps of the aisle to leave he fell and seriously injured his knee. The plaintiff introduced evidence to the effect that the tread of the stair was worn thin by use, and that there was a nail protruding about one-sixteenth of an inch; that the board from which the nail protruded gave a little when stepped on and the nail then stuck up about three-sixteenths of an inch. In that case, the court held:

"The projection of a nail three-sixteenths of an inch on a wooden step in the aisle of the gallery of a theater, by reason of the board of the step being worn down by use, is not a defect for which the person in control of the theater is liable to one injured by a fall caused by his heel catching on the protruding nail." Syl.

In connection with this question, it will be helpful to note the following succinct declaration appearing in 20 R. C. L., p. 13, § 9:

"The foundation of liability, then, is knowledge—or what is deemed in law to be the same thing: opportunity by the exercise of reasonable diligence to acquire knowledge—of the peril which subsequently results in injury."

We are of opinion that the trial court erred in denying defendant's motion for a nonsuit, and likewise in failing to give to the jury defendant's requested instruction with relation to the plaintiff's allegation that the hallway leading to the steps was not properly lighted at the time of the accident.

This case is reversed and remanded.

McBride, J., did not participate in this decision.